IN THE SUPREME COURT OF MISSISSIPPI
NO. 92-CA-01177-SCT

*JOE W. SMITH, JR., JOE W. SMITH, AND CLOVIS SMITH*

*v.*

*NATALIE CASH MALOUF, ALEX J. MALOUF, JR., AND PATRICIA MALOUF*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/21/92 |
| TRIAL JUDGE: | HON. EUGENE M. BOGEN |
| COURT FROM WHICH APPEALED: | LEFLORE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | J. BRAD PIGOTT |
| | MARY MARVEL FYKE |
| ATTORNEYS FOR APPELLEES: | JAMES W. BURGOON, JR. |
| | JAMES E. UPSHAW |
| | F. EWIN HENSON, III |
| NATURE OF THE CASE: | CIVIL - TORTS (OTHER THAN PERSONAL INJURY AND PROPERTY DAMAGE) |
| DISPOSITION: | REVERSED AND REMANDED - 9/24/98 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 10/15/98 |

**EN BANC.**

**BANKS, JUSTICE, FOR THE COURT:**

¶1. Here we are confronted with a challenge to the propriety of the lower court's dismissal of a suit, which alleged intentional infliction of emotional distress, conspiring to prevent the appellant-father from exercising his parental rights and conspiring to effect an illegal adoption of a child born out of wedlock. Because they have no standing, we affirm the dismissal of the appellant-grandparents' claim. The appellant-father, on the other hand, should have been afforded his day in court on his claims of intentional infliction of emotional distress and conspiracy to deprive him of his parental rights. Accordingly, we reverse and remand this matter to the trial court for further proceedings.

**I.**

¶2. In May 1989, teenagers Joey Smith and Natalie Malouf began dating, and in August 1991,

Natalie discovered that she was pregnant. She told Joey about the pregnancy on August 16. The following day Joey asked Natalie to marry him, and they discussed their options regarding the baby although no decision was made at that time. Joey and Natalie told her parents (hereinafter "the Maloufs") about the pregnancy. The Maloufs told Joey the child would be put up for adoption and the pregnancy would be kept private until then.

¶3. The next day, August 18, Joey returned to the Maloufs' home in an attempt to change their minds about the adoption. Their minds were set. On August 19 Joey confided in his pastor about the pregnancy. Together, they told his parents (hereinafter "the Smiths") that Joey would soon be a father. After finding out about the baby, the Smiths went to the Maloufs and told them that they did not want the child to be placed for adoption and that they were willing to take full responsibility for the child. The Maloufs remained firm in their decision regarding the child's adoption.

¶4. The record is not clear, but it would appear that Natalie and Joey's romance went sour soon after she discovered she was pregnant. When he called her on September 7, Natalie asked him not to call again. At some point in that month, Joey consulted an attorney about the situation, but he did not take any formal action at that time. A few months later in December, the Smiths visited Natalie at school in Indiana. According to the Maloufs, the Smiths kidnapped and badgered Natalie regarding the child's adoption.

¶5. In January 1992, Joey went to the Maloufs' home and was told that Natalie was gone and that she would not be back until the child was born. On January 14, 1992, Joey initiated legal proceedings against Natalie in the Leflore County Chancery Court, seeking a declaration of paternity, order for custody of the child and injunctive relief to stop adoption proceedings within and outside Mississippi. Because Natalie could not be reached for service of process, she was served by publication on three separate dates -- February 21 and 28 and March 6. On March 9, one of Natalie and Joey's mutual friends called Joey and asked him to drop the suit against Natalie, informing him Natalie said she would not put the child up for adoption if he dropped the suit.

¶6. Joey applied for a temporary restraining order enjoining the commencement of adoption proceedings on March 12. The TRO was served on Natalie via her father. On March 27, the chancellor issued a permanent injunction in the form of a final judgment, enjoining Natalie and "all who might assist her" from proceeding with an adoption. Joey and his parents mailed the chancellor's order to all Vital Statistics offices in the State of Mississippi. He also hired investigators to trace Natalie's whereabouts. On April 18, Natalie called Joey and told him the birth of their child was imminent and that she was healthy. She asked him to sign the adoption papers, and she also mentioned private adoption.

¶7. The baby was born on April 21, 1992 in Marietta, Georgia. After discovering her whereabouts, Joey went to Georgia and retained an attorney to assist in getting custody of the child. However, his attempts were too late. Natalie and her parents traveled to California where the baby was adopted to Canadian parents.

¶8. Joey and his parents sued Natalie and her parents in circuit court, alleging civil conspiracy and intentional infliction of emotional distress. In September 1992, Natalie and her parents filed motions to dismiss the complaint. The chancellor stayed all proceedings in chancery court and suspended all prior orders except the declaration of Joey's paternity. On October 2, 1992, Joey's California attorney

learned that the child had been adopted by parents in Alberta, Canada. The Canadian adoption was put on hold pending the resolution of the Mississippi action. On October 22, the circuit court granted the 12(b)(6) motions to dismiss filed by the Maloufs and Natalie. Joey filed notice of appeal from that order on November 13, 1992.

¶9. Joey and the Smiths assign as error the following:

ISSUE I

**THE COURT ERRED IN RULING THAT BECAUSE JOEY SMITH IS AN UNWED FATHER (RATHER THAN AN UNWED MOTHER), HE HAS NO PARENTAL RIGHTS TO RECEIVE NOTICE OF ANY ADOPTION OF, OR TO OBJECT TO ANY ADOPTION OF, OR TO SEEK LEGAL CUSTODY UPON THE BIRTH OF, HIS BIOLOGICAL CHILD.**

ISSUE II

**THE CIRCUIT COURT'S RULING THAT MR. AND MRS. JOE SMITH LACKED STANDING TO CLAIM DAMAGE, FLOWING EITHER FROM THE DEFENDANTS' UNLAWFUL CONSPIRACY OR FROM THE DEFENDANTS' INFLICTION OF EMOTIONAL DISTRESS UPON THEM, WAS ERRONEOUS.**

ISSUE III

**PLAINTIFFS ESTABLISHED ALL ELEMENTS OF THEIR CLAIMS FOR PURPOSES OF RULE 12.**

ISSUE IV

**THE CHANCERY ORDER ENTERED IN A SEPARATE JUDICIAL PROCEEDING, THAT DEFENDANTS SEEK TO INSERT INTO THE RECORD IN THE INSTANT CAUSE, IN NO WAY ADVERSELY AFFECTS PLAINTIFFS' CLAIMS FOR RULE 12 PURPOSES.**

ISSUE V

**THE DISTRICT COURT ERRED IN HOLDING THAT JOEY SMITH WAS LIMITED TO SEEKING REDRESS FOR THE TORTIOUS ACTIONS OF THE MALOUFS BY RESORT TO CONTEMPT PROCEEDINGS IN THE CHANCERY COURT.**

ISSUE VI

**THE DISTRICT COURT ERRED IN HOLDING THAT BECAUSE THE DEFENDANTS WERE EXERCISING UNSPECIFIED "RIGHTS TO TRAVEL**

**FREELY THROUGHOUT THE UNITED STATES AND TO BE LEFT ALONE,"
THEY WERE SHIELDED FROM LIABILITY FOR DAMAGES CAUSED BY THEIR
INTENTIONAL TORTS.**

## II.

### *a.*

¶10. This Court, in adjudicating Rule 12(b)(6) motions, has held that upon a motion for dismissal pursuant to M.R.C.P. 12(b)(6) for failure to state a claim upon which relief can be granted, the pleaded allegations of the complaint must be taken as true, and a dismissal should not be granted unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which entitles him to relief. *Overstreet v. Merlos*, 570 So. 2d 1196, 1197 (Miss. 1990).

¶11. "A motion to dismiss under MRCP 12(b)(6) tests the legal sufficiency of the complaint . . . . [T]o grant this motion there must appear to a certainty that the plaintiff is entitled to no relief under any set of facts that could be proved in support of the claim." *Busching v. Griffin*, 465 So. 2d 1037, 1039 (Miss. 1985). In *Carpenter v. Haggard*, 538 So. 2d 776, 777 (Miss. 1989), this Court further explained that "[u]nder the MRCP it is only necessary for the complaint to show that the plaintiff is entitled to some relief in court in order to survive a Rule 12(b)(6) motion." The dismissal of a complaint on a 12(b)(6) motion is reviewed *de novo*. *Tucker v. Hinds County*, 558 So. 2d 869, 872 (Miss. 1990); *UHS-Qualicare, Inc. v. Gulf Coast Community Hosp., Inc.*, 525 So. 2d 746, 754 (Miss. 1987).

### *b.*

¶12. We first examine whether Joey had a right to notice of the adoption of his child or a right to object to that adoption under state or federal law. If under current law Joey was so entitled but was prevented from achieving such by and through the actions of Natalie and her parents, the Maloufs, then he is indeed entitled to a trial on his conspiracy and tort claims. With that issue in mind, we begin by looking at the pertinent Mississippi statutes and case law governing this issue.

¶13. Miss. Code Ann. § 93-17-5 (1994) provides in relevant part:

> In the case of a child born out of wedlock, the father shall not be deemed to be a parent for the purpose of this chapter, and no reference shall be made to the illegitimacy of such child [during the adoption process].

The effect of this provision is that the putative father of a child does not have to be notified of an adoption proceeding because he is not considered a parent under the statute and parents are the only parties statutorily required to be made parties to the adoption proceeding. Thus, § 93-17-5 expressly indicates that Joey was not entitled to notice of the adoption of his child nor was his consent to the adoption necessary.[1] Thus under the statutory law of this state, Joey has no right to complain about the adoption of the child. *See Humphrey v. Pannell*, 710 So. 2d 392, 395 (Miss. 1998).

¶14. Despite the conclusiveness of § 93-17-5, several United States Supreme Court decisions demonstrate the unconstitutionality of our statute. In fact, the constitutionally suspect nature of § 93-17-5 was recognized recently by this Court in *Humphrey v. Pannell*. There we stated that:

> Although Miss. Code Ann. § 93-17-5 and applicable decisions of this Court do not require notification of the natural unwed father of an illegitimate child, applicable United States Supreme Court decisions nevertheless make it clear that this Mississippi statute [§ 93-17-5] would be unconstitutional in its application in certain cases, particularly in cases in which the natural unwed father has attempted to establish a substantial relationship with the child.

*Id.* at 396 (citing N. Shelton Hand, ***Mississippi Divorce, Alimony, and Child Custody***, § 21-5 (3rd. ed. 1992)).

¶15. Beginning with ***Stanley v. Illinois***, 405 U.S. 645, 651-63 (1972), the United States Supreme Court for the first time stated that under certain circumstances the Constitution protected the parental rights of an unwed father. These circumstances included instances in which the putative father had participated in the "companionship, care, custody, and management" of his child. Under those circumstances, his custodial rights to the child could not be revoked without a hearing to determine his parental fitness.

¶16. Since this seminal case, the Supreme Court has clarified and in many ways expanded the rights of unwed fathers. Six years after ***Stanley***, the Supreme Court in ***Quilloin v. Walcott***, 434 U.S. 246 (1978) rejected a putative father's quest to veto the adoption of his eleven-year-old child. The Court found that the father wholly failed to have or seek custody of the child nor had he ever shouldered any significant responsibility with respect to the daily supervision, education, protection and care of the child. Thus, that case established the requirement of a meaningful relationship with the child and not simply proof of biology.

¶17. Then there was ***Caban v. Mohammed***, 441 U.S. 380 (1979) where the unwed father had custody of his children for several years. Under the applicable New York law, the putative father was merely entitled to notice of the proposed adoption of his children following the mother's death and an opportunity to present evidence on the children's best interest. A sharply divided Supreme Court struck down the New York statute on equal protection grounds, concluding that the undifferentiated distinction between unwed mothers and unwed fathers did not bear a substantial relationship to the State's asserted interests. The Court further found that the father and children had lived together for many years, thereby having established and maintained a significant, supportive relationship. The Court therefore concluded the father should have the privilege of vetoing the adoption of his children. Once again, the Supreme Court was greatly influenced by the fact that the putative father had initiated and carried out a substantial relationship with the children.

¶18. ***Lehr v. Robertson***, 463 U.S. 248, 261-62 (1983) dealt with an unwed father's attempt to block the adoption of his child by the stepfather. The Supreme Court noted that putative father had never lived with the child or mom, nor had he provided any type of financial support. In short, the father had never "grasped the opportunity to form a relationship" with his child even though the pertinent statute provided him ample procedural protection to do so. As such, the Supreme Court rejected his equal protection claims, likening the father to Quilloin, who also had never even attempted to establish a substantial relationship with the child.

¶19. While the preceding cases provided much needed protection to the rights of those unwed fathers who had "grasped the opportunity" to establish a relationship with their children, they failed to

address the issue before us -- what, if any, constitutional protections should be given to a putative father whose child was adopted immediately after birth, thereby prohibiting him from establishing any type of substantial relationship with the child. This very situation has been addressed by the New York County Surrogate Court in *In re Adoption of Baby Girl S*, 535 N.Y.S.2d 676 (1988).

¶20. There, the child was born on April 24, 1988. *Id.* at 677. The adoption proceedings commenced on May 4. On March 2 -- fifty-three days before the child was born -- the unwed father filed a petition to establish his paternity and obtain custody of the unborn child. *Id.* After several failed attempts, the mother was served with an order on May 6 to show cause that restrained her "from removing or causing the removal" of the child from the county.

¶21. On May 13, counsel for the mother and father appeared in Family Court. The mother's attorney failed to inform the court that she had given birth on April 24 and that the child had been placed for adoption in New York County. The restraining order was continued and the matter was adjourned until June 9. In the interim, the mother appeared in the Surrogate Court to place her consent to the adoption on the record. On June 9, the mother told the trial judge and the putative father that she had given birth. The judge ordered the mother to appear in court with the baby on June 14. On that date, she came to court and informed the judge that she had surrendered the baby for adoption. That same day, the father filed with the Putative Father Registry. The next day his attorney informed the Surrogate Court about the paternity and custody proceedings initiated by the father.

¶22. The Surrogate Court appointed a guardian *ad litem* for the child, and a trial on the issue of paternity was scheduled for July 18. On the morning of trial, the mother admitted she lied about her husband being the father of the child and that the attorney for the adoptive parents had advised her to give the "mistaken" responses. The putative father was determined to be the father of the child, and a hearing was scheduled to determine his rights in the adoption proceeding.

¶23. At this hearing, the mother announced that she wished to revoke her consent to the adoption and to either take custody of the child or give her to the father. The mother also corroborated the father's testimony from the paternity hearing. Specifically, she confirmed that he told her upon finding out that she missed her menstrual period, "I love you and want to marry you." The mother further admitted that at one point she told the father she was not pregnant and then terminated their relationship. Also she disclosed that the attorney advised her to say she found out about the adoptive parents via an advertisement in the paper because the attorney was not supposed to be the go-between for an adoption. *Id.* at 678. When the father learned (from a friend) about the pregnancy, he asked the mother to give the child to him. At one point, he even went to see her and offered her $8,000 to help pay for her expenses. The mother continued to tell him the baby was not his. The mother's testimony established that she and the adoptive parents worked in concert to "mastermind something" to deal with "the latest Gus [the putative father] issue," knowing that the mother's estranged husband -- whose consent to the adoption they submitted -- was not in fact the child's father.

¶24. The Surrogate Court found that the adoptive parents (both attorneys) and their counsel orchestrated the whole proceeding so that the court would not discover the omission of Gustavo from the adoption petition. The petition was, in the Surrogate Court's words, "a blatant attempt to make an end run around the Family Court proceedings." *Id.* at 680. The Court further concluded that

when the mother consented to the adoption in Surrogate Court she violated the lower court's restraining order. In short, the Court determined that the adoption proceeding was "permeated with fraud and misrepresentation" and dismissed it accordingly. *Id.*

¶25. Despite this ruling, the Court went on to state that Gustavo had "grasped the opportunity" to develop a relationship with his daughter and accepted responsibility for her future. Furthermore, the Court noted to hold that no unwed father has a right to prevent an unwed mother from placing their child for adoption immediately at birth would create an invidious gender-based distinction between the rights of unwed fathers and unwed mothers. *Id.* at 684.

¶26. *Baby Girl S* was affirmed by the New York Court of Appeals in the consolidated case of *In re Raquel Marie X.*, 559 N.E. 2d 428 (N.Y. 1990). Addressing whether "the full measure of constitutional protection -- the right to a continued parental relationship absent a finding of unfitness -- [is] ever required where a child is placed for adoption before any real relationship can exist, and if so, what actions on the unwed father's part would demonstrate his willingness to take parental responsibility sufficient to give rise such rights," that court of appeals concluded that such an interest must be recognized in appropriate circumstances as a matter of federal constitutional law. *Id.* at 424. In order to fall within this constitutional protection, however, the unwed father must come forward to immediately assume parental responsibilities and he must do so in a prompt and substantial manner, including public acknowledgment of paternity, payment of pregnancy and birth expenses, steps taken to establish legal responsibility for the child, and other factors evincing a commitment to the child. *Id.* at 428. Any unfitness, waiver or abandonment on the part of the father works to his detriment. *Id.* All of these requirements had been met by the father in *Baby Girl S*, where the evidence indicated the father had sought full custodial responsibility virtually from the time he learned of the mother's pregnancy and that he had done everything possible to manifest and establish his parental responsibility. *Id.*

¶27. The instant matter is very analogous to *Baby Girl S.* Taking the allegations in the complaint as true, from the moment he learned of her pregnancy Joey asked Natalie to marry him. Upon being rejected, he told her that he wanted to keep the child and that he would provide her with financial and any other type of support necessary. When it was disclosed that Natalie and the Maloufs did not want the child, Joey and the Smiths appealed to them to give the child to Joey on more than one occasion. Their pleas were disregarded. Joey sought legal advice, but did not institute legal proceedings until Natalie and her parents orchestrated a scheme whereby Natalie and her mother traveled across the United States and the continent to avoid Joey until the child was born and adopted.

¶28. While they were moving from state to state and country to country, Joey -- like the father in *Baby Girl S* -- was "grasping every opportunity" to manifest and establish a relationship with his child. He filed a declaration of paternity, obtained a permanent injunction against Natalie and all others working with her to prohibit an adoption of the child, hired private investigators to locate Natalie and mailed the permanent injunction to every Vital Statistics office in Mississippi as well as other states. In sum, he did all he could have done under the circumstances. Unfortunately as the Court realized in *Baby Girl S*, the unwed father who attempts to establish a parental relationship can be thwarted by the unwed mother's interference. Such was the case here.

¶29. Though our state's common law and statutory law did not vest Joey with any protections

regarding his right to receive notice of the adoption of his child or to object or veto said adoption, he was entitled to greater constitutional protections under the federal constitution and the dismissal of his suit was therefore improper. As noted in **Humphrey v. Pannell**, here we are presented with a situation in which the natural unwed father attempted in every way possible to establish a substantial relationship with the child. He was unable to do so because of the mother and her parents.

¶30. As the United States Supreme Court has established, Joey had a constitutional right to be notified of or to withhold his consent to the adoption of his child in light of his substantial and prompt attempts to establish a relationship with his child. Section 93-17-5, as a bar to the instant action, then cannot stand up to constitutional scrutiny. *See also* **Nale v. Robertson**, 871 S.W.2d 674 (Tenn. 1994) (ruling that a Tennessee statute, which allowed adoption to occur before an unwed father's parental rights had been determined, was unconstitutional).

*c.*

¶31. Joey -- faced with the certainty of never gaining custody of his son -- has sued Natalie and her parents for intentional infliction of emotional distress and conspiracy. This state recognizes recovery for both negligently and intentionally inflicted emotional distress:

> Where there is something about the defendant's conduct which evokes outrage or revulsion, done intentionally -- or even unintentionally yet the results being reasonably foreseeable -- Courts can in certain circumstances comfortably assess damages for mental and emotional stress, even though there has been no physical injury. In such instances, it is the nature of the act itself -- as opposed to the seriousness of the consequences -- which gives impetus to legal redress.

**Leaf River Forest Prods., Inc. v. Ferguson**, 662 So. 2d 648, 658 (Miss. 1995) (quoting **Sears Roebuck & Co. v. Devers**, 405 So. 2d 898, 900 (Miss. 1981)).

¶32. We have, on a number of occasions, considered the tort of intentional infliction of emotional distress. *See* **Fuselier, Ott & McKee, P.A. v. Moeller**, 507 So. 2d 63 (Miss. 1987) (firing of attorney, including changing of door locks to office not sufficient conduct); **T.G. Blackwell Chevrolet Co. v. Eshee**, 261 So. 2d 481 (Miss. 1972) (forging of car buyer's name on finance contract, sufficient conduct); **Lyons v. Zale Jewelry Co.**, 246 Miss. 139, 150 So. 2d 154 (1963) (abusive bill collection tactics amounted to sufficient conduct). The standard is whether the defendant's behavior is malicious, intentional, willful, wanton, grossly careless, indifferent or reckless. **Leaf River Forest Prods., Inc. v. Ferguson**, 662 So. 2d 648, 659 (Miss. 1995).

¶33. If there is outrageous conduct, no injury is required for recovery for intentional infliction of emotional distress or mental anguish. **Id.** at 658. One who claims emotional distress need only show that the emotional trauma claimed was a reasonably foreseeable consequence of the negligent or intentional act of another. **First National Bank v. Langley**, 314 So. 2d 324 (Miss. 1975) If the conduct is not malicious, intentional or outrageous, there must be some sort of demonstrative harm, and said harm must have been reasonably foreseeable by the defendant. **Strickland v. Rossini**, 589 So. 2d 1268, 1275 (Miss. 1991).

¶34. The first aspect we must consider is what type of conduct occurred between Joey and Natalie

and the Maloufs. Natalie argues she was entitled to put the child up for adoption, just like she would have been entitled to have an abortion had she been so inclined. Thus it is her position that she cannot be held liable for infringing upon Joey's rights when in fact she was only exercising her own right to place the child for adoption.

¶35. Natalie is correct insofar as she acknowledges that this Court is faced with two individuals' diametrically opposed legal rights -- her right to place the child for adoption and Joey's constitutional right to establish and maintain a relationship with his child. However her reliance on her constitutionally protected right to an abortion is of no moment since she was not hiding in order to effectuate an abortion. In other words, had Natalie been seeking an abortion there would have been little Joey could have done to prohibit her or to assert an interest that would have outweighed her right to abort the child. *See Doe v. Smith*, 486 U.S. 1308 (1988) (denying an application for an injunction, seeking to enjoin a mother from aborting the child on grounds that the mother's interests in aborting the child outweighed the father's interests notwithstanding *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52 (1976)). This is not an abortion case however. Once Natalie decided to carry the child full-term and place the child for adoption, Joey's constitutionally protected rights became viable.

¶36. Hence, the pivotal question here is whether Natalie and her parents owe damages to Joey for interfering with his right to attempt to gain custody of the child by exercising her own right to terminate her relationship with the child. Stated otherwise, the issue is whether Joey has a viable claim for intentional infliction of emotional distress, thereby rendering the circuit court judge's dismissal of his claim improper. Taking the well-pled allegations in the complaint as true, we conclude that he does.

¶37. It is irrefutable that appellees' behavior was intentional and that the foreseeable result of their actions was that the child would be adopted by strangers, thereby depriving Joey of an opportunity to veto the adoption and vie for custody. It is also axiomatic that any father -- especially a father who has gone that "extra mile" to gain custody of his child -- would suffer severe emotional distress due to the child he wanted being secretly placed for adoption. Thus, this Court concludes that Joey has presented a viable claim for intentional infliction of emotional distress. *See Kessel v. Leavitt*, 1998 WL 407096 (W. Va.) (affirming a verdict for damages in similar circumstances).

### III.

¶38. Joey also sued Natalie and the Maloufs for effectuating a conspiracy to prevent him from establishing a relationship with his child. A conspiracy is "a combination of persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully." *Shaw v. Burchfield*, 481 So. 2d 247, 255 (Miss. 1985). Civil conspiracy, which results in damage, may give rise to a right of recovery. *Id.* (citing *Bailey v. Richards*, 236 Miss. 523, 537-38, 111 So. 2d 402, 407-08 (1959)).

¶39. The instant claim is that the defendants conspired to unlawfully violate the outstanding injunction and to deprive Joey of his lawful rights as natural parent of the child. These allegations are sufficient to pass Rule 12(b)(6) muster, and Joey should have been afforded the opportunity to present the merits of this claim.

### IV.

¶40. We turn now to the propriety of the suit initiated by the Smiths, Joey's parents, against Natalie and her parents, the Maloufs. In the circuit court proceedings, Natalie and the Maloufs argued that as grandparents the Smiths had no legal standing to assert rights involving a grandchild. The circuit court agreed with this contention and therefore ruled that the Smiths could not maintain an action for unlawful conspiracy to violate the chancery court injunction, prohibiting Natalie and anyone else working with her in going forward with the adoption.

¶41. The Smiths presently argue that they did, in fact have standing to assert a claim against Natalie and the Maloufs. In particular, they assert -- even though they were not parties to the chancery injunction and their own parental rights were not violated -- they have standing because they were damaged by the Maloufs' unlawful conspiracy which deprived their son of his parental rights and which resulted in the illegal adoption of their only grandchild. They further posit that they suffered "mental and emotional distress" and that they have "expended a great deal of resources" because of Natalie and her parents' conduct. In short, they contend these damages provided them with a colorable interest in the subject matter of this litigation and the circuit court's finding of no standing was clearly erroneous.

¶42. The Maloufs respond that the Smiths are not parents, nor were they parties to the chancery court injunction. The Smiths therefore cannot complain that the injunction was violated. Natalie likewise counters that only she and Joey were parties to the injunction, thereby making it impossible for the Smiths to sue her or her parents (who were not parties to the injunction).

¶43. We conclude that in order to prevail on these claims it must be established that the plaintiffs had some legal interest at stake. We find no such legal interest on the part of the Smiths. We therefore affirm so much of the judgment as dismisses their claim for failure to state a cause of action upon which relief could be granted.

## V.

¶44. Finally, it is asserted that Joey's only remedy is to institute contempt proceedings in the chancery court. We reject that contention. Conduct may be at once tortious and violative of a court order. The victim is not thereby deprived of a tort remedy simply because the conduct complained of also violated a court order. *See Mitchell v. Stevenson*, 677 N.E.2d 551, 563 (Ind. Ct. App. 1997) (holding that defendant's actions constituted contempt and evidence supported finding of intentional infliction of emotional distress). It is also asserted that to hold Natalie liable violates her constitutional right to travel. We also reject that claim. Parties may exercise constitutional rights in a manner which unlawfully damages others. When they do so, they can be held accountable. *See Kathleen K. v. Robert B.*, 198 Cal. Rptr. 273 (Cal. Ct. App. 1984) (constitutional right to privacy did not protect respondent from a suit for damages based upon severe injury to the appellant's body resulting from the contraction of genital herpes after respondent misrepresented that he was disease-free); *see also Doe v. Roe*, 267 Cal. Rptr. 564 (Cal. Ct. App. 1990) (holding same).

¶45. For the foregoing reasons, the judgment of the circuit court is hereby reversed, except as herein provided, and this matter is remanded to that court for further proceedings.

¶46. **REVERSED AND REMANDED.**

**PRATHER, C.J., SULLIVAN, P.J., McRAE AND ROBERTS, JJ., CONCUR. PITTMAN, P.J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY McRAE AND ROBERTS, JJ. SMITH, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY MILLS, J. MILLS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY SMITH, J. WALLER, J., NOT PARTICIPATING.**

**PITTMAN, PRESIDING JUSTICE, SPECIALLY CONCURRING:**

¶47. I write separately to emphasize that this is a suit for the tort claims of intentional infliction of emotional distress and conspiracy to deprive Mr. Smith of his parental rights against Ms. Malouf and her parents. This is not an abortion case. I concur with Justice Banks' assessment that under precedents of the United States Supreme Court, Mississippi Code Ann. § 93-17-5 does not meet the test of the United States Constitution. Stanley v. Illinois, 405 U.S. 645 (1972), Lehr v. Robertson, 463 U.S. 248 (1983), Caban v. Mohammed, 441 U.S. 380 (1979), Quilloin v. Walcott, 434 U.S. 246 (1978).

¶48. The legislature might consider revisiting this unconstitutional statute and allowing the biological father's rights (in regard to a child born out of wedlock) to be born at the precise moment of the birth of the child. The father would have no say during the pregnancy but his interest can be born literally out of the child's birth.

¶49. The interest of the biological father must be demonstrated and he would be subject to all the requirements of establishing that he can be a good father, but he should not be prohibited by state statutes from having a voice in the child's well-being and indeed cannot be denied his interest without notice according to rulings of the United States Supreme Court before cited.

¶50. If parties conspire to deny the Father his constitutionally protected interest in fatherhood, after he has made known his desire of custody or his desire to be considered, such act or acts rise to the level of tort. To hold otherwise in this case leaves Smith with constitutional rights that were wronged, but no remedy. The remedy we impose pales when compared with Smith's loss, but it is the only remedy available to Smith or this Court.

¶51. To deny Smith the opportunity of fatherhood after birth because it may cause a wrongful abortion is to do wrong to prohibit wrong.

¶52. The United States Supreme Court in Stanley v. Illinois, 405 U.S. 645, 649 (1972) determined that a biological father, under the due process clause of the United States Constitution, was:

> entitled to a hearing on his fitness as a parent before his children were taken from him and that, by denying him a hearing and extending it to all other parents whose custody of their children is

challenged, the State denied Stanley [unwed biological father] the equal protection of the laws guaranteed by the Fourteenth Amendment.

The United States Supreme Court found it repugnant that under the Illinois law, "Stanley [unwed biological father] [was] treated not as a parent but as a stranger to his children . . . ." Id. at 648.

¶53. Similarly, under Mississippi's statute regarding parental consent to adoption, Miss. Code Ann. § 93-17-5 (1994) states in relevant part:

> In the case of a child born out of wedlock, the father shall not be deemed to be a parent for the purpose of this chapter, and no reference shall be made to the illegitimacy of such child.

Under Mississippi's statute, the unwed biological father is treated as a legal stranger to his child. That, under Stanley v. Illinois, is unconstitutional.

¶54. In Lehr v. Robertson, 463 U.S. 248, 262 (1983), the United States Supreme Court, while finding in favor of granting the adoption to the husband of the biological mother over the objection of the biological father, did recognize the significance of the biological connection between the child and the biological father.

> The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie.

Id. at 262.

¶55. In the present case, Joey [biological father] made every effort to be a part of the child's life, to the extent of repeatedly offering to adopt and raise the child himself. All of his efforts were rebuffed by Natalie [biological mother] and her parents who insisted on forever severing Joey's child from him. This, under Lehr v. Robertson, is unconstitutional.

¶56. The United States Supreme Court in Quilloin v. Walcott, 434 U.S. 246, 255 (1978) again recognized "the relationship between parent and child is constitutionally protected." The State was required in that case to find nothing more "than that the adoption, and denial of legitimation, were in the 'best interests of the child.'" Id. In the present case, Natalie is not trying to prevent Joey from establishing his parental rights because she wants custody of the child herself. Rather, Natalie wanted a family from Canada to adopt the child. It is a very difficult argument for Natalie and the Maloufs to make that removing the child to Canada, to be adopted by a family which is of no relation to the child, would be in the child's best interest, when the child's biological father (who has not been proven unfit) desperately desires to raise and nurture his child. For Natalie and her parents to succeed without notice to the biological father was unconstitutional under Quilloin v. Walcott.

¶57. Finally, in Caban v. Mohammed, 441 U.S. 380, 382 (1979), the United States Supreme Court held a New York statute unconstitutional which allowed a man's children to be adopted by their biological mother and her husband without the biological father's consent on equal protection

grounds. The Court reasoned that "[g]ender-based distinctions 'must serve important governmental objectives and must be substantially related to achievement of those objectives' in order to withstand judicial scrutiny under the Equal Protection Clause." Id. at 388 (citation omitted).

¶58. The Mississippi statute in the present case allows the biological mother to put a child up for adoption without obtaining the biological father's consent and in this instance without notice to the father. Where, as here, the biological father has made every effort to establish both a relationship with the child and his rights in relation to the child, to allow the mother to circumvent all of his efforts and agree to the adoption over his vehement objections is unconstitutional under the reasoning of the United States Supreme Court in Caban v. Mohammed.

¶59. The majority holding of this present case will bring Mississippi into the ranks of a growing number of jurisdictions which have, pursuant to the above mentioned United States Supreme Court decisions, recognized the importance of the natural father's relationship with his offspring. See In re Adoption of B.G.S, 556 So. 2d 545, 558-59 (La. 1990); Appeal of H.R., 581 A.2d 1141, 1162-63 (D.C. 1990)(separate opinion of Ferren, Assoc. J.); In re Petition of Kirchner, 649 N.E.2d 324 (Ill. 1995).

¶60. It is surprising that some, who for fear of increasing the likelihood of abortions in the state, would trample the rights of biological fathers who are trying to love, care for, and provide for their children; and do so in the name of family values. No one wishes to see abortions increase, but cutting off rights of fathers to be fathers to their children is certainly not the proper means to that end. I concur with the majority opinion.

**McRAE AND ROBERTS, JJ., JOIN THIS OPINION.**

**SMITH, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶61. I agree with the majority that Joe W. Smith and Clovis Smith have no legal standing to assert rights regarding this child. Their intentions and actions were indications of care and love towards their son and his child. Unfortunately, the law affords them no remedy.

¶62. However, the majority's far reaching decision allowing Joe Jr. to proceed in his tort claims of intentional infliction of emotional distress and conspiracy to deprive him of his parental rights against Natalie Malouf and her parents, Alex J. Malouf, Jr. and Patricia Malouf will have an extremely significant impact upon a woman's decision whether to place a child for adoption.

¶63. The majority by recognizing such a tenuous tort of emotional distress and conspiracy in these type situations, indirectly encourages women to flock to abortion clinics and terminate their pregnancies in order to escape civil penalties possibly attached to making a decision to carry the child to full term.

¶64. It is hard to fathom that a woman wanting to exercise her right to terminate her pregnancy could travel to an abortion clinic unfettered by the State, her lover or for that matter even her husband, but once she decides to continue the pregnancy, she is no longer free to travel and go on about her business. It is because of this ironical injustice, that I respectfully dissent.

¶65. The United States Supreme Court for decades through the Due Process Clause of the

Fourteenth Amendment has recognized the right of individuals to be free from State interference in private decision making involving the family, such as marriage, procreation, contraception, family relationships, child rearing, and education. *Loving v. Virginia*, 388 U.S. 1 (1967) (interracial marriages); *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535 (1942) (procreation); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925) (the right to educate one's child as one chooses); *Meyer v. Nebraska*, 262 U.S. 390 (1923) (the right of private schools to teach as they see fit); *Griswold v. Connecticut*, 381 U.S. 479 (1965 ) (use of contraception between married couples); *Eisenstadt v. Baird*, 405 U.S. 438 (1972) (use of contraception between unmarried couples). This very general liberty was later extended to encompass the right of a woman to control her own destiny according the dictates of her conscience in regard to child bearing. *Roe v. Wade*, 410 U.S. 113 (1973) (right to terminate a pregnancy); *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992) (modified the right to terminate a pregnancy).

¶66. In *Roe v. Wade*, 410 U.S. 113 (1973), the United States Supreme Court held that a woman's decision to abort a fetus is a "fundamental right." Implicit in such a holding is the converse -- i.e., that if a woman made a decision not to abort a fetus, such decision deserves equal treatment under the law, as an equally fundamental right. In *Planned Parenthood of Southeaster Pennsylvania v. Casey*, the Court modified its holding in *Roe* and concluded that reproductive rights were not "fundamental," and that the State had an interest in the life of the fetus and that a State may regulate abortion procedures in ways rationally related to that legitimate state interest, so long as the State regulation did not pose an "undue burden." Nonetheless, *Casey* still "retained" and "reaffirmed" the "essential holding" of *Roe*. *Casey*, 505 U.S. at 846.

¶67. Because a woman has a "liberty" interest in making reproductive decisions, a substantive component of that liberty is to allow the woman to make these decisions without State interference or State enforcement of family and friend interference. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993) (reproductive decisions not only warrant State non-interference, but also protection from interference by protestors).

¶68. "It is a promise of the Constitution that there is a realm of personal liberty which the government may not enter. We have vindicated this principle before." *Casey* 505 U.S. at 847. "Neither the Bill of Rights nor the specific practices of States at the time of the adoption of the Fourteenth Amendment marks the out limits of the substantive sphere of liberty which the Fourteenth Amendment protects." *Casey* 505 U.S. at 848. Our cases recognize "the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt,* 405 U.S. at 453. "These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define attributes of personhood were they formed under compulsion of the State." *Casey*, 505 U.S. at 851.

¶69. The *Casey* Court recognized that there were two ways to perceive *Roe*. One was as an exemplar of *Griswold* type liberty. The other was a rule of personal autonomy and bodily integrity. The present case involves both of these aspects in that Joey has attempted to use the law to hold Natalie hostage to Greenwood, Mississippi, and he has also sought to use the law to divest Natalie of the exercise of

her full reproductive rights. Because the Constitution recognizes and promotes a woman's decision to carry her child to full term, this right would indeed be a hollow right if she were not also allowed to decide the fate of her child once she gave birth.

¶70. Having given a general overview of reproductive rights, this case also deals with the question of whether a nonmarital biological father (a putative father) has any rights when he has sired a child out of wedlock. A simple answer to this question would be yes, as it has been addressed by the United States Supreme Court in many different contexts. However, the primary question in the case *sub judice* is whether those rights of a putative father would override the rights of a woman to control her reproductive rights. Having already discussed the concept of reproductive rights, we now look at what the United States Supreme Court has said in regards to the rights of nonmarital biological fathers, in order to weigh and balance the two interests.

¶71. In *Stanley v. Illinois*, 405 U.S. 645, 655 (1972), the United States Supreme Court held unconstitutional an Illinois statute which conclusively presumed every father of a child born out of wedlock to be an unfit person to have custody of his children. Stanley had lived with the children all their lives and had lived with their mother for 18 years. There was nothing in the record to indicate that Stanley was a neglectful father. The Court held that the Due Process Clause was violated by the automatic destruction of the custodial relationship without giving the father any opportunity to present evidence regarding his fitness as a parent.

¶72. In *Quilloin v. Walcott*, 434 U.S. 246 (1978), the United States Supreme Court upheld the constitutionality of a Georgia statute requiring putative fathers to legitimate the child in order to be able to exercise veto power over the child's adoption. There, the natural father, Quilloin, never legitimated the child, and sought visitation rights and filed a petition for legitimation only after the mother had remarried and her new husband had filed an adoption petition.

¶73. In *Caban v. Mohammed*, 441 U.S. 380 (1979), the United States Supreme Court considered a New York statute which gave an unwed mother the authority to block an adoption simply by withholding her consent, but which only gave an unwed father the right to block the adoption by showing that the best interests of the child would "not permit the child's adoption." *Caban* involved the claims of two natural parents who had maintained joint custody of their children from the time of their birth until they were respectively two and four years old. Relying on both the Equal Protection Clause and the Due Process Clause, the father challenged the validity of an order authorizing the mother's new husband to adopt the children. Applying intermediate scrutiny, the United States Supreme Court found that where the putative father had established a "substantial relationship" with the child, the Equal Protection Clause would prohibit the double standard. While the Court did not really address the Due Process claim, it did comment that where an unwed father demonstrates a full commitment to the responsibilities of parenthood by "com[ing] forward to participate in the rearing of his child," his interest in personal contact with the child acquires substantial protection. *Caban,* 441 U.S. at 392.

¶74. More interesting is the dissent in *Caban*, for it addresses some of the issues present in the case *sub judice*. But before we display Justice Stevens' remarks, it must be borne in mind that the mother in *Caban* was not asserting her reproductive rights as the children involved were two and four years old and had already established a relationship with their natural father.

[*Caban*] concerns the validity of rules affecting the status of the thousands of children who are born out of wedlock every day. All of these children have an interest in acquiring the status of legitimacy; a great many of them have an interest in being adopted by parents who can give them opportunities that would otherwise be denied; for some [of] the basic necessities of life are at stake. . . .

Nevertheless, it is also true that [the statute] gives rights to natural mothers that it withholds from natural fathers. Because it draws this gender-based distinction between two classes of citizens who have an equal right to fair and impartial treatment by their government, it is necessary to determine whether there are differences between the members of the two classes that provide a justification for treating them differently. . . . But it also requires analysis that goes beyond a merely reflexive rejection of gender-based distinctions.

Men and women are different, and the difference is relevant to the question whether the mother may be given the exclusive right to consent to the adoption of a child born out of wedlock. Because most adoptions involve newborn infants or very young children, it is appropriate at the outset to focus on the significance of the difference in such cases.

Both parents are equally responsible for the conception of the child out of wedlock. But from that point on through pregnancy and infancy, the differences between the male and the female have an important impact on the child's destiny. Only the mother carries the child; it is she who has the constitutional right to decide whether to bear it or not. In many cases, only the mother knows who sired the child, and it will often be within her power to withhold that fact, and even the fact of her pregnancy, from that person. If during pregnancy the mother should marry a different partner, the child will be legitimate when born, and the natural father may never even know that his "rights" have been affected. On the other hand, only if the natural mother agrees to marry the natural father during that period can the latter's actions have a positive impact on the status of the child; if he instead should marry a different partner during that time, the only effect on the child is negative, for the likelihood of legitimacy will be lessened.

These differences continue at birth and immediately thereafter. During that period, the mother and child are together; the mother's identity is known with certainty. The father, on the other hand, may or may not be present; his identity may be unknown to the world and may even be uncertain to the mother. These natural differences between unmarried fathers and mothers make it probable that the mother, and not the father or both parents, will have custody of the newborn infant.

In short, it is virtually inevitable that from conception through infancy the mother will constantly be faced with decisions about how best to care for the child, whereas it is much less certain that the father will be confronted with comparable problems. There no doubt are cases in which the relationship of the parties at birth makes it appropriate for the State to give the father a voice of some sort in the adoption decision. But as a matter of equal protection analysis, it is perfectly obvious that at the time and immediately after a child is born out of wedlock, differences between men and women justify some differential treatment of the mother and father in the adoption process.

Most particularly, these differences justify a rule that gives the mother of the newborn infant the

exclusive right to consent to its adoption. Such a rule gives the mother, in whose sole charge the infant is often placed anyway, the maximum flexibility in deciding how best to care for the child. . . . Finally, it facilitates the interests of the adoptive parents, the child, and the public at large by streamlining the often traumatic adoption process and allowing the prompt, complete, reliable integration of the child into a satisfactory new home at as young an age as is feasible. Put most simply, it permits the maximum participation of interested natural parents without so burdening the adoption process that its attractiveness to potential adoptive parents is destroyed.

This conclusion is borne out by considering the alternative rule proposed by appellant. If the State were to require the consent of both parents, or some kind of hearing to explain why either's consent is unnecessary or unobtainable, it would unquestionably complicate and delay the adoption process. Most importantly, such a rule would remove the mother's freedom of choice in her own and the child's behalf without also relieving her of the unshakable responsibility for the care of the child. Furthermore, questions relating to the adequacy of notice to absent fathers could invade the mother's privacy, cause the adopting parents to doubt the reliability of the new relationship, and add to the expense and time required to conclude what is now usually a simple and certain process. While it might not be irrational for a State to conclude that these costs should be incurred to protect the interest of natural fathers, it is nevertheless plain that those costs, which are largely the result of differences between the mother and the father, establish an imposing justification for *some* differential treatment of the two sexes in this type of situation.

**With this much the Court does not disagree; it confines its holding to cases such as the one at hand involving the adoption of an *older* child against the wishes of a natural father who previously has participated in the rearing of the child and who admits paternity**. *Ante*, at 392-393. The Court does conclude, however, that the gender basis for the classification drawn by [the statute] makes differential treatment so suspect that the State has the burden of showing not only that the rule is generally justified but also that the justification holds equally true for all persons disadvantaged by the rule. In its view, since the justification is not as strong for some indeterminately small part of the disadvantaged class as it is for the class as a whole, see *ante*, at 393, the rule is invalid under the Equal Protection Clause insofar as it applies to that sub-class. With this conclusion I disagree.

. . .

The mere fact that an otherwise valid general classification appears arbitrary in an isolated case is not a sufficient reason for invalidating the entire rule. Nor, indeed, is it a sufficient reason for concluding that the application of a valid rule in a hard case constitutes a violation of equal protection principles.

*Caban,* at 441 U.S. at 402 - 412 (Stevens, J., dissenting) (footnotes omitted) (emphasis added). This passage is long, and it speaks volumes as to what the majority actually decided. The only reason that *Caban* was resolved in the manner in which it was, was due to the fact that there were *older* children involved, and children who arguably had some relationship with their father. *Caban* did not involve a newborn. Moreover, the dissent makes clear that this case could have turned out very differently had the mother been asserting her "freedom of choice" or her "privacy" rights. While Justice Stevens'

view of the matter was not endorsed or adopted by the majority at that time, neither was it rejected; the majority just chose to answer the question at hand. Subsequently, three years later, the Supreme Court did adopt Justice Stevens' view. While Justice Stevens could have limited his opinion to the fact that he was unwilling to trash a statute because it may have been unconstitutional only as applied to a small subset, he took license to make some extremely important observations. In his dissent, Justice Stevens predicted that there would be clash between a woman asserting her reproductive rights in regard to a newborn and a putative father asserting his rights, and since that was not the question in *Caban*, the majority did not touch upon it. That very question is now haunting this Court, which it should answer with the greatest of delicacy. Unfortunately, that has not occurred.

¶75. Shortly after *Caban*, in *Lehr v. Robertson*, 463 U.S. 248 (1983), the United States Supreme Court upheld the adoption of a child where the putative father had not been notified since the State of New York had a registry in which putative fathers could enroll so as to guarantee notification to them should their illegitimate child be placed on the adoption block. Lehr attempted to block his child's adoption by the unwed mother's new husband. The child's mother married the new husband eight months after her birth, and the new husband sought to adopt the child when she was two years old. Lehr had neither offered to marry the mother, nor had he supported the child custodially, personally, or financially. The Court found that if the natural father fails to grasp the opportunity to develop a relationship with his child, the Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie. *Lehr,* 463 U.S. at 256-263.

¶76. Finally, in *Michael H. v. Gerald D*., 491 U.S. 110 (1989), the Court tackled a California statute which provided the child of a married woman cohabitating with her husband is presumed to be a child of the marriage, as long as the husband is not impotent or sterile. The statute provided that the presumption could not be rebutted by a putative father, but only by the husband or wife, and only within the first two years of the child's birth. Five justices found that the putative father, Michael H., was not deprived of any protected liberty interest, holding that a statute giving categorical preference to a husband over an adulterous lover is not unconstitutional.

¶77. From a general overview, a distinction can be drawn between "developed parent-child relationship" that was implicated in *Stanley* and *Caban*, and the "potential relationship" involved in *Quilloin* and *Lehr*. *Lehr,* 463 U.S. at 261. At first, the most simplistic assessment of these cases would be "if and when one [a father] develops [a] relationship [with] his natural child, [then only] is [he] entitled to protection against arbitrary state action as a matter of due process." *Lehr*, 463 U.S. at 260 (quoting *Caban*, 441 U.S. at 414). However, factoring in *Michael H*., that understanding of the putative father's rights is debatable, as Michael H. did not receive any favored status even after maintaining a substantial relationship with his child, since the Court found his rights must succumb to the rights of the marital family.

¶78. In view of the United States Supreme Court cases of *Stanley, Quilloin, Caban, Lehr,* and *Michael H.*, it would be uncertain whether Joey has any rights as a putative father, as the case at bar has a very different fact pattern in comparison to the putative fathers cases. First, not one of those cases dealt with the issue *sub judice*, where the natural mother is asserting her reproductive rights against the rights of the putative father. Second, *Stanley* and *Caban*, which in my view were correct, involved a situation where the father had already established a relationship. Here, since Joey cannot claim to have had a "substantial relationship" with his child, the holdings in those two cases are not

applicable. Third, even though *Lehr* and *Quilloin* might appear applicable, as those appellants, like Joey, argued that they had the "potential" to hold a relationship with their child, Joey's claim is different in that he "intended" to have a substantial relationship with the child and desired to raise the child, and only missed out on his "opportunity" because of Natalie's actions, and not his own inactions. In that sense, the outcome of all of these putative fathers cases may be inapplicable to Joey's situation. However, Natalie refused to marry Joey and in spite of all his claims of good intention, there is not proof that Joey provided any support whatsoever which was one of the *Lehr* court's main concerns.

¶79. Nonetheless, it is indeed helpful to look for certain truths that run in those cases, which would be applicable in the present context, regardless of the fact differences. As a base concept, it can be said that "the mere existence of a biological link does not merit equivalent constitutional protection." *Lehr,* 463 U.S. at 261. In fact, at the onset, the Court noted that it "disagree[d]" with appellant Lehr's assertion that Stanley and Caban "g[a]ve him an absolute right to notice and an opportunity to be heard before the child may be adopted." *Lehr* , 463 U.S. at 250. *Lehr* made clear that there are no absolute rights for putative fathers, when it cited with approval Justice Stevens' dissent in *Caban*, which observed:

> "Even if it be assumed that each married parent after divorce has some substantive due process right to maintain his or her parental relationship, . . . it by no means follows that each unwed parent has any such right. Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring." 441 U.S., at 397. . . .

*Lehr*, 463 U.S. at 260. The Court touted the same mentality when Michael H. argued that *Stanley* and progeny established that "a liberty interest [wa]s created by biological fatherhood plus an established parental relationship." *Michael H.,* 491 U.S. at 123. The Court found that line of reasoning "distort[ed] the rationale of those cases." *Michael H* . at 123. The Court concluded that the putative fathers cases all recognized a "historic respect-- indeed, sanctity would not be too strong a term-- traditionally accorded to the relationships that develop within the unitary family." *Michael H* ., 491 U.S. at 123. The court also concluded "that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition." *Michael H* ., 491 U.S. at 124. Because Michael H. and his daughter Victoria D.'s quasi-family relationship was not one which had been treated as a "protected family unit" under our society's "historic practices" or on any "special protection" basis, it was constitutional to have a statute which gave a categorical preference to the marital family. *Michael H.,* 491 U.S. at 124, 129. Thus, the essence of Justice Scalia's opinion in *Michael H* . was that persons in the position of Michael H. have never been accorded historical protections, but since traditional family units have, the family's rights to maintain its integrity and to be free from assault would supersede the rights of a putative father claiming his interests. When "the child is born into an extant marital family, the natural father's unique opportunity conflicts with the similarly unique opportunity of the husband of the marriage; and it is not unconstitutional for the State to give categorical preference to the latter." *Michael H* ., 491 U.S. at 129.

¶80. At first glance, one might wonder if *Michael H* . applies *sub judice*, as Natalie was unmarried at the time of the child's birth, thus, not really having a "family unit" which could claim these protections

afforded by our traditions and history. The concern of *Michael H.*-- that the family unit can be assailed by outsiders-- really is not present in this case. However, just the fact that there were competing interests in *Michael H*. proves it to be the most instructive for deliberations in this case.

¶81. In *Michael H. v. Gerald D.*, the competing interests between a natural putative father and a marital father was the crux of the issue. The plurality observed that "to *provide*protection to an adulterous natural father is to *deny* protection to a marital father, and vice versa. . . . One of them will pay a price. . . ." *Michael H*. 491 U.S. at 130 (emphasis in original). Likewise, assuming arguendo that Joey had any liberty interests in this situation, then his interests are in competition with that of Natalie's interests to make her reproductive choices unhampered. To provide protection to Joey's alleged interests would be to deny Natalie the free exercise of her constitutionally protected options. In my view, under our state laws and the federal laws, it is Joey who must "pay the price" here, for we find that his interests in putative fatherhood are neither sufficiently realized nor protected, while it is well established that her liberty interests in reproductive choice are both recognized and vigilantly guarded.

¶82. Joey maintains that he should not be faulted for not being able to come within the purview of the cases that do give putative fathers certain rights if they had established a substantial relationship with the child. *Stanley, Caban*, *supra.* Joey asserts that but for the fact that Natalie chose to have this baby out-of-state, and then chose to place the child for adoption in a foreign country, he was denied the opportunity to follow through on his intention to raise and support this child. Therefore, I pose the question whether Joey has gained an interest based on his mere "intentions" to raise his child, after all, his intentions may alter significantly in the future! First, the fact that a putative father maintained a substantial relationship with the child is of little consequence, as indicated by the Supreme Court's last pronouncement in *Michael H.*. Second, in thoroughly reviewing the case law on putative fathers, not one of them stands for the proposition that a putative father has rights based on his "potential" or his "intentions" to rear the child. *Stanley, Quilloin, Caban, Lehr, Michael H.*, *supra*. Lastly, as previously stated, the ultimate question before this Court is whether Joey's alleged rights would supersede Natalie's reproductive rights.

¶83. In exercise of her rights, the first question Natalie must answer for herself is whether or not to have the child. Under the current interpretation of the Constitution, either choice is protected. *Roe, Casey*, *supra.* Once that decision has been made, she must make other decisions which are the necessary corollary to her first decision. It is well established that "[w]ithout . . . peripheral rights the specific rights would be less secure." *Griswold,* 381 U.S. at 482-83.

¶84. For example, had Natalie decided to have an abortion, she would then have the right to decide which abortion doctor to visit, which women's clinic to use, and where and how to conduct herself both before and after the exercise of this choice. *Roe, Casey, Bray*, *supra*. Similarly, since Natalie decided not to have an abortion, she then had to decide from which obstetrician to seek medical care, in which hospital she wanted to deliver her child, and where and how she wanted to keep herself both pre- and post- delivery.[(2)] *Roe, Casey, Bray*, *supra.*

¶85. "[W]hile [these rights are] not expressly included in [the respective Amendment, their] existence is necessary in making the express guarantees fully meaningful." *Griswold*, 381 U.S. at 483. There are "specific guarantees in the Bill of Rights [which] have penumbras, formed by emanations from

those guarantees that help give them life and substance." *Griswold,* 381 U.S. at 484.

¶86. Because the Constitution recognizes and promotes a woman's decision to carry her child to full term, this right would indeed be a hollow right if she were not also allowed to decide the fate of her child once she gave birth. "Her suffering is too intimate and personal for the State to insist, without more, upon its own vision of the woman's role, however dominant that vision has been in the course of our history and our culture." *Casey* at 852.

¶87. Here, the record establishes that Natalie chose to carry the child to full term not only because of religious conviction, but because she wished for her child to be reared in a two parent home, far and away from her own backyard, and to avoid any confusion that a child might experience living in the same small community as the mother who chose to give the child away. "At the heart of liberty is the right to define one's own concept of existence. . . . ." *Casey* 505 U.S. at 851. It is clear that the reproductive choice she made was due in part to her belief that she could put the child up for adoption to a stable two-parent family, out of sight out of mind from her own domain, and no longer be subject to any financial responsibilities or ties with her child.[3]Because Natalie wished for this outcome for her baby and herself, she "chose" to carry it to full term. "The destiny of the woman must be shaped to a large extent on her own conception of her spiritual imperative and her place in society." *Casey* 505 U.S. at 852. Therefore, any limitations on the legal choices she makes for herself or her child, in-utero or post-delivery, is a limitation on her initial reproductive right of choice. There are "specific guarantees in the Bill of Rights [which] have penumbras, formed by emanations from those guarantees that help give them life and substance." *Griswold*, 381 U.S. at 484. Thus, Natalie not only has a Fourteenth Amendment Due Process liberty interest in carrying her child to full term, she has a correlating penumbra-like liberty interest in seeking to insure the destiny of her child, once born, as it relates to her, even to the detriment of that child's natural (putative) father.

¶88. What would the freedom of speech mean if persons were told that they could print anything they wanted, but the government would be responsible for the delivery, dissemination, and placing of the products. What would the freedom of association mean if persons were told that they could congregate with whomever they wanted, but once they left the congregation, they must associate with others they did not want to? Similarly, what would Natalie's reproductive rights mean if she were allowed all the freedom she wanted during pregnancy, but the moment her child was brought into this world, she would either have to turn it over to Joey or have to face the prospect of associating with it? Natalie's right to place her unborn child for adoption, to the exclusion of the child's natural father, is but a natural extension of her reproductive rights. That right has always been there, this dissenting opinion merely fleshes it out.

¶89. All this to say, that men who are as haphazard and careless as this, do not have substantive due process rights in regard to offspring of their seed. These type of "putative fathers" rights claims are reeking havoc for adoptions. While one might sympathize with the father and his current desire to help raise this child, it must be remembered that there are no guarantees that his interest in the child will continue. Months or even years from now, if the father's conduct does not measure up, it will be the mother who will be left holding the baby and picking up the pieces. Today, many men are reaping a supposed benefit of premarital and extramarital sex, without any of the consequences. Men are not only creating these illegitimate children, but are then demanding notice about said child's adoption in the process of making less than half-hearted attempts to support their issue, and essentially holding

the lives of child's mother in abeyance for months and sometimes years to come, all under the pretense of procedural and substantive due process. Consistent with *Stanley* and *Caban*, this Court should hold that when men who father children out of wedlock incur substantive legal obligations, either voluntarily or through court order, then and only then, do certain rights attach. "[T]he Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition." *Michael H.*, 491 U.S. at 124. While our society has reached the point where we can no longer look to the law to engender responsible behavior, we can interpret the law to preserve the remaining vestiges of a concept called "family."

¶90. A sub-issue has arisen by our consideration of this issue, and should be answered in order not to appear inconsistent to our citizenry. The question is why should the mother of the child have such greater rights than the father. In other words, why does she get to pick and choose whether or not she wants to hold the putative father responsible, but the putative father on the other hand has no such correlating right? While this question looks as if it might pose some sort of impermissible gender distinction, in actuality, it does not. Again, some one will have to "pay a price." As has already been thoroughly discussed in this opinion, by insisting on the putative father's rights to be equal to that of the mother, we cast a dark shadow on her ability to make an unfettered reproductive choice. However, by giving the initial right of self-determination for the baby to the mother, there is no similar weight placed on the father. If the mother of the child holds the putative father legally responsible for his offspring, then he is only paying the just consequences of his conduct. However, if the mother of the child places the child for adoption, then the putative father will either feel that he lucked out or feel a sense of loss, depending on his mind set.

¶91. When the outcome is like the one at bar, the putative father seems to emotionally tug at this Court's heart by asking us to sympathize with his sense of loss-- with his feelings of knowing that he has a child out there somewhere that he can't even know. Again, the putative father will have two sets of emotions depending on the reproductive choice the mother of the child has made. Either he can feel sadness at the prospect of his lover's decision to abort the child, or he can unfortunately feel joy and relief knowing that he has narrowly managed to escape his responsibilities. Either he can feel sadness over the mother's decision to have the child and place it for adoption, or joy over her decision to place the child for adoption and again allow him the privilege of foregoing his legal responsibilities. Whatever choice she makes, the putative father will be affected with some sort of emotion; either he will know he has a dead baby or he will know he has a live baby. The law does not require this Court to curb the rights of women just because the man may experience one of these emotions in regard to the life status of the baby. *Casey,* 505 U.S. at 898. (holding that husband's notification or consent not required for an abortion).

¶92. Against this backdrop, we must now address the propriety of the lower court's decision to grant a Rule 12 (b)(6) motion on both the conspiracy claim and the intentional infliction of emotional distress claim. The court found that Joey had no legally cognizable right under Mississippi law to notice of his child's adoption, so in essence, he had no paternal rights that were capable of violation, and further found that Mr. and Mrs. Smith lacked standing to assert a conspiracy claim against the Maloufs. The court also found that the Maloufs had merely been enjoying their constitutionally protected rights to travel freely throughout the United States and the world and to be left alone, therefore, the defendants could not have entered a conspiracy by exercising that which they had a legal right to do. The emotional distress claim was also dismissed on the ground that it was not

wrong to exercise a constitutionally protected right, regardless of the consequence to others.

¶93. The facts are undisputed. Natalie became pregnant by Joey. Natalie chose to have the baby and desired to give it up for adoption as a result of that choice. The Smiths brought an injunction against her in the Chancery Court of LeFlore County to stop her from putting the baby up for adoption to anyone but Joey. She left LeFlore County and traveled to various parts of the United States and Europe. The Maloufs assisted her in her travels. The Smiths expended great effort to locate her. She had the baby in Georgia and placed the child for adoption in California to a Canadian couple. Hence, this action was brought for emotional distress and conspiracy in the Circuit Court of LeFlore County.

¶94. A civil conspiracy is a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Shaw v. Burchfield*, 481 So. 2d 247, 255 (Miss. 1985). In this case, adoption of an illegitimate child is a lawful end. Traveling in the United States is a lawful purpose. Traveling in Europe is lawful also. The Maloufs (who were not even a part of the injunction) giving money to their own daughter Natalie in order to help support and maintain her is likewise as lawful as any other parent giving money to a child to vacation and travel. Surely the plaintiffs are not asserting that just because of Natalie's reproductive state, she must forego her constitutional rights and no longer receive travel allowances from her parents; after all, if one were free to vacation in Europe when one was not carrying a child, should that freedom be dissolved because one was pregnant? *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280, 284 (1987) (it is wrong to discriminate against women on the basis of pregnancy). Thus, not only was the end not an unlawful purpose, neither was the method for achieving it.

¶95. Now, it is obvious that Natalie's travel was in an effort to maintain privacy avoiding Joey and to have the baby placed for adoption with a family. Again, even that is not an unlawful purpose in that she was exercising her own privacy rights, reproductive rights, right to associate (or not associate), and right to travel. The record does not establish that Natalie's actions were all a part of a grand scheme to hurt Joey. She simply did what she needed to do for her own life, and in her opinion, the baby's best interest. Desiring a certain outcome and tranquility for one's life is not an unlawful end, and traveling long distances so as to avoid others and have that peace is not an unlawful means. If anything, Natalie could just as easily counterclaimed on a conspiracy against Joey and the Smith's for doggedly pursuing, harassing, and infringing upon her privacy rights. She did not do so. Why? Possibly, pursuit of money was not her concern, but rather, only her own peace of mind, desire to be left alone, and to provide a proper two parent loving home for her child somewhere well away from Greenwood, Mississippi. In this regard, the Smiths claim for conspiracy is deficient, as a matter of law.

¶96. I respectfully dissent.

**MILLS, J., JOINS THIS OPINION.**

**MILLS, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶97. I join with Justice Smith in his concurrence in part and dissent in part and write separately only to express my views in this matter.

¶98. Few cases before this Court have engendered such strong feelings as the matters presently before us. While none of the parties to this proceeding are blameless, each should also be commended to a degree. First, the daughter, Natalie Malouf, and her parents, should be commended for opting to birth the child and placing it for adoption. Ironically, the majority opinion will encourage women to seek abortions rather than birth in order to avoid a potential hassle with putative fathers.

¶99. The efforts of Joe Jr. to have a voice in the rearing of the child are also commendable. However, the briar thicket he is in was created by his own actions. I find it hard to countenance his claims of intentional infliction of emotional distress when he was an acting participant in the questionable behavior precipitating the pregnancy and resulting litigation. I would not allow these tort claims to continue. The broad language in the majority opinion expanding claims for intentional infliction of emotional distress absent other damages is unnecessary to the development of tort law in this state.

¶100. Finally, the true heartbreak and distress suffered by Joe W. Smith and Clovis Smith are apparent. It is tragic that this undoubtedly caring and loving family must live with the cold impact of the law in this case. Though their intentions are undoubtedly without fault, they simply have no rights under the law to pursue this matter. The law is incapable of fashioning a remedy for every perceived wrong in society.

¶101. I join the majority opinion only to the extent that it holds that Joe W. Smith and Clovis Smith have no legal standing to assert any rights in this cause. I would affirm the lower court on all other matters.

**SMITH, J., JOINS THIS OPINION.**

1. The Mississippi Legislature amended § 93-17-5 during the 1998 legislative session. Subsection (3) was rewritten to allow the father to have a right to object to an adoption if he has demonstrated a full commitment to the responsibilities of parenthood within 30 days after the birth of the child. The amendment was effective beginning July 1, 1998 and is effective until July 1999. From and after July 1999, subsection 3 of 93-17-5 reverts to the language existing before the amendment.

2. "The right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read, . . . and freedom of inquiry, freedom of thought, and freedom to teach . . . -- indeed the freedom of the entire university community." *Griswold* 381 U.S. at 482 (citations omitted). Similarly, freedom of association is more than just the right to peacefully attend a meeting; a penumbra of this right would entail the right of a group not to disclose one's membership list. *Griswold*, 381 U.S. at 483. "Without those peripheral rights the specific rights would be less secure." *Griswold*, 381 U.S. at 482-83.

3. The Smiths never offered to adopt the child, which would have left Natalie without any legal responsibilities or ties. They only offered to help support Joey's decision and aid financially whenever possible. Obviously, Joey cannot adopt his own child, thus, if he raised the child, he would have had legal recourse to force financial support from Natalie, and have had the capacity to forever embroil her in a situation from which she wanted to separate herself.