BARNES, J.,
for the Court:
¶ 1. This appeal stems from a Newton County Chancery Court judgment where Vincent S. Parker’s[1] amended petition to set aside the adoption of his natural son, Andy, by Melanie J. Watkins and Mark S. Lewis, was dismissed with prejudice. On appeal, Parker argues that he cannot have his parental rights terminated, as he was never made a party to the adoption proceeding and did not receive notice,[2] and that the chancellor erred in dismissing the case under Mississippi Rule of Civil Procedure 60(b) and Mississippi Code Annotated section 93-17-6 (Supp.2012).[3] While it is undisputed that Parker did not receive formal notice of the adoption (and should have), this fact does not mean that the adoption is void, as Parker contends. Even if Parker had received notice, he did not meet the standard of demonstrating “a full commitment to the responsibilities of parenthood” under section 93-17-5(3), which would have allowed him, as an unwed father, to object to the adoption. Accordingly, we find no reversible error, and affirm the adoption of Andy and the termination of Parker’s parental rights.
STATEMENT OF FACTS AND PROCEDURAL HISTORY
¶ 2. Dana Foster and Parker conceived a child, Andy, who was born out of wedlock on May 25, 2004. At the time, Dana was seventeen years old and Parker was nineteen years old. The couple never married, and Parker was not listed as the father on the birth certificate at the hospital. The certificate was never amended. During her pregnancy, Dana lived with Parker at his mother and step-father’s mobile home in Brandon, Mississippi. Dana was unemployed, and Parker did seasonal work. Approximately six weeks after Andy’s birth, Dana moved out of the residence because she and Parker were not getting along. She also suspected Parker was using drugs. Apparently, Dana did not keep in touch with Parker after she left.
¶ 3. Dana moved to her father’s mobile home in Richland, Mississippi, where she lived for about a week. Then, Dana and Andy moved in with Mark Lewis, Dana’s brother (Andy’s natural uncle), and Melanie Watkins, his wife, in Newton County, Mississippi, for approximately one month. *1245 After a “little fuss,” Dana moved back to her father’s residence.
¶ 4. Soon after, in August 2004, Melanie notified the Mississippi Department of Human Services (MDHS), alleging Andy was living in “deplorable conditions” at the mobile home of Dana’s father. The Rankin County Youth Court appointed a guardian ad litem (guardian) on behalf of Andy. Dana told MDHS investigators that she wanted to give custody of Andy to Susie and Joe Kirk, friends of Dana’s family and godparents to Andy. The Kirks were granted temporary custody, and in September 2004, MDHS concluded that there was no evidence of neglect by Dana. However, the youth court directed Dana to fulfill certain prerequisites before she would be eligible to have Andy returned to her.
¶ 5. In November 2004, Melanie and Mark requested the youth court change Andy’s custody from the Kirks to them. Melanie testified the Kirks had no objection to this change; thus, after a “shelter hearing,” Melanie and Mark were awarded temporary custody.
¶ 6. In January 2005, Andy’s first guardian recommended a petition for neglect against Dana be filed in the youth court, because she “has not made progress in improving her ability to care for this child. Dana is bouncing from house to house, wherever anyone will let her stay.” Additionally, the guardian reported Andy was “thriving” with Melanie and Mark. In March 2005, the youth court issued an order finding Andy neglected by Dana, and Andy remained in Melanie and Mark’s custody.
¶ 7. Also in March 2005, Melanie, with Andy, met Parker at a Waffle House in Brandon, Mississippi, and told him of her intent to adopt Andy. Melanie testified that Parker told her he thought the adoption was in Andy’s best interest — he did not “need to be a father” at the time, and did not want Dana to have custody.
¶ 8. In April 2005, Dana signed a consent to Andy’s adoption by Melanie and Mark, and to the termination of her parental rights. On October 26, 2005, a petition for adoption by Melanie and Mark was filed in the Newton County Chancery Court; Parker was not made a party to the proceedings. At this time, Parker’s paternity had not been established because he had thus far ignored the youth court’s recommendations to have a DNA test performed. On December 16, 2005, the final decree of adoption was entered.
¶ 9. Nearly four years later, in September 2009, Dana filed a motion to set aside the adoption. Then, in late 2009, Dana approached Parker, asking him to file a petition to set aside the adoption. In May 2010, Parker filed such a petition, seeking custody of Andy, and Dana joined it. In the petition, Parker claimed Melanie and Mark committed fraud in bringing the adoption proceedings because they intentionally did not notify Parker. Also, he claimed Melanie and Mark conspired together, and coerced Dana into signing the adoption papers. Parker stated Melanie intentionally kept the child away from him and thwarted his efforts at paternity testing.
¶ 10. In December 2010, the chancellor dismissed Dana’s petition as untimely under Mississippi Code Annotated section 93-17-15 (Rev.2004) because her petition was not filed within six months of the adoption, but Parker’s petition remained on the docket. In January 2011, the chancellor ordered paternity testing, and Parker complied. The test confirmed Parker is Andy’s biological father. Also, Parker filed an amended petition to set aside the adoption. In it, he stated that he received *1246 no service of process or notice of the adoption.
¶ 11. In April 2011, a guardian was appointed to represent Andy in the proceedings. The guardian filed a detailed report on all of the parties in July 2011. In his report, the guardian opined that while the adoption did not meet the minimum standards of due process, the fact that Parker had made no attempt to visit Andy from 2005 to 2010, even though he had telephone numbers and “with just a little effort” could have found Melanie, is “a cliff rather than a hill for Mr. Parker to climb” regarding termination of his parental rights. The guardian recommended that if parental rights were not terminated, Andy remain with Melanie and regular visitation start slowly with Parker, and he pay child support to Melanie.
¶ 12. In July 2011, a hearing was held on Parker’s petition to set aside the adoption. Melanie testified that she did not serve Parker the adoption petition or obtain consent from him in October 2005 because her attorney did not advise her to do so. Further, Parker had not been adjudicated Andy’s father at that point. Melanie stated Dana did tell her Parker was the father; however, Melanie expressed her doubts, as Dana was dating several men at the time of Andy’s conception. Melanie testified at no point did Parker make an attempt to visit or contact Andy.
¶ 13. Mark testified that he and Melanie divorced in approximately 2007, and Melanie has full custody of Andy. Mark now lives in Nevada, and has only visited Andy four times since the divorce.[4] Mark claimed he knew where Parker lived, but Melanie never asked for the information. Also, Parker had not asked him for information about Andy in the last five years.
¶ 14. Parker testified that he provided financial support to Dana during her pregnancy, as Dana had no income. He also transported her to the doctor. He claimed he and Dana were engaged before she became pregnant. Once Dana and Andy moved out of his parents’ mobile home in June 2004, approximately one month after Andy was born, Parker did not have much contact with her. Parker claimed not to have received summonses for the youth court proceedings, but found out about them through his mother, whom Dana had told about the proceedings.[5] When he met Melanie at the Waffle House, he agreed to the adoption as long as he could visit Andy, but the record indicates he never did. Initially, Parker claimed he had no idea that the December 2005 adoption had taken place until “a couple of years” later, but on cross-examination he stated that he had knowledge of the adoption in May 2006. He was not served any summonses to appear in chancery court, and did not know in which county the adoption took place. He made an effort to communicate with Andy by calling and emailing Melanie, but denied knowing where she lived. He had not seen Andy since the Waffle House meeting over six years ago.
¶ 15. On cross-examination, Parker admitted that he had made no attempt to have his name placed on Andy’s birth certificate from the time of Andy’s birth until his petition to set aside the adoption, or approximately six years. Importantly, Parker admitted that he had an “arrangement” with Dana — she would pay for the adoption litigation, but she wanted visitation rights if Parker obtained custody of *1247 Andy. At the time of the hearing, Parker was married to another woman and had two other children. They resided at the mobile home in Brandon. Parker was a general laborer but unemployed, although he hoped to start a new job the following week.
¶ 16. Dana testified that Parker supported her during the pregnancy — he bought groceries, clothes, and a crib for Andy. She also stated he helped care for the baby. Dana claimed to thwart Parker’s relationship with Andy by not giving him her new telephone number. Dana stated she left the house of Parker’s parents because she suspected Parker was using marijuana and crystal methamphetamine — a claim Parker denied. She also admitted that she was paying for this litigation, and if Parker received full custody, she hoped to receive visitation rights from Parker. Dana visited Andy occasionally until October 2009, when the visits ceased due to a conflict with Mark and Melanie. She was aware that Andy had been diagnosed with severe attention deficit hyperactivity disorder.
¶ 17. Andy’s guardian cross-examined all four witnesses. The investigative reports from the MDHS and the youth court proceedings from 2004 were entered into evidence, as well as the DNA paternity report from January 2011. At the conclusion of Parker’s case, Melanie’s counsel moved for dismissal under Rule 60(b) and for failure to satisfy the requirements of section 93-17-6.[6]
¶ 18. In August 2011, the chancellor issued a final judgment dismissing the petition, finding the petition was not filed within a reasonable time under Rule 60(b), and Parker failed to satisfy section 93-17-6’s requirements regarding his commitment to the responsibilities of fatherhood. Parker’s parental rights were terminated. Parker filed a motion to reconsider, which was denied. He then timely appealed and asserts the following: (1) as a matter of law, a father cannot have his parental rights terminated if he was never made a party to an adoption proceeding or served with process; (2) the chancellor erred in applying Rule 60(b) and section 93-17-6 to set aside the adoption; and (3) the chancellor abused his discretion in dismissing the case under Rule 60(b) and section 93-17-6.
ANALYSIS OF THE ISSUES
¶ 19. It is undisputed that Parker did not receive proper notice of the adoption. As Andy’s biological father, he should have been made a party to the proceedings under section 93-17-5. However, this omission does not mean the adoption is void. The analysis hinges on whether Parker had the right, as an unwed father, to object to the adoption under section 93-17-6. The chancellor found Parker did not have this right, and there is substantial evidence supporting this finding in the record.
1. Notice
¶ 20. Parker argues that the chancellor erred as a matter of law in terminating his parental rights and not setting aside the adoption because Melanie and Mark did not make him a party to the adoption in 2005. Also, he contends they deprived him of formal notice of the adoption, even though they knew of Parker’s paternity and physical location. Parker alleges the chancellor failed to follow clear precedent and compulsory statutes on these matters. *1248 He also claims these omissions violated his constitutional rights to due process.
¶ 21. This issue presents a question of law, which is reviewed de novo. In re Adoption of J.E.B., 822 So.2d 949, 951 (¶ 4) (Miss.2002) (citing Dep’t of Human Sens, v. Gaddis, 730 So.2d 1116, 1117 (¶ 4) (Miss. 1998)). Additionally, we note generally the setting aside of an adoption decree is disfavored in Mississippi. See id. at 952 (¶ 10) (citing Humphrey v. Pannell, 710 So.2d 392, 399 (¶ 35) (Miss.1998)). There is a strong public policy declaration in Mississippi’s adoption statutes for the finality of adoption decrees. In re Adoption of M.D.T., 722 So.2d 702, 705 (¶ 12) (Miss.1998) (citing In re Adoption of R.M.P.C., 512 So.2d 702, 707 (Miss.1987)).
¶ 22. It is well established that the United States Supreme Court has offered constitutional protection to the rights of unwed fathers who have tried to have relationships with their children. Stanley v. Illinois, 405 U.S. 645, 651-59, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), held for the first time that under certain circumstances, such as when the putative father has participated in the care and custody of his child, the Constitution protected an unwed father’s parental rights. The Supreme Court clarified the rights of unwed fathers six years later in Quilloin v. Walcott, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978), where the Court established the requirement of a meaningful relationship with the child, and not just proof of biology, in a putative father’s attempt to set aside an adoption. In Quilloin, the appellant did not petition for legitimation of his child for eleven years, between the child’s birth and the filing of the adoption petition. Id. at 249, 98 S.Ct. 549. The father failed to seek custody of the child, and never had significant responsibility for the child regarding supervision, education, and care. Id. at 247, 256, 434 U.S. 246. The Supreme Court held that the natural father’s substantive rights under the Due Process Clause were not violated by applying the “best interest of the child” standard in this instance, and the adoption was affirmed. Id. at 254, 256, 98 S.Ct. 549. In Caban v. Mohammed, 441 U.S. 380, 392-94, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979), the Supreme Court concluded the unwed father, who had had custody of his children for several years and thereby established a significant, supportive relationship, should have the privilege of vetoing the adoption of his children, not merely receiving notice.
¶ 23. Both parties note in their briefs that at one time section 93-17-5 did not entitle an unwed putative father any notice whatsoever of an adoption. In Smith v. Malouf 722 So.2d 490, 497 (¶ 30) (Miss.1998) (impliedly overruled on other grounds), the Mississippi Supreme Court held that this notice provision of the statute was unconstitutional in light of United States Supreme Court authority. Smith held that a natural unwed father may, in certain circumstances, have a constitutional right to be notified or to withhold his consent to an adoption. Id. The Mississippi Legislature thereafter amended section 93-17-5(3), allowing a father to have the right to object to an adoption if he has demonstrated “a full commitment to the responsibilities of parenthood” within thirty days after the birth of the child. Smith, 722 So.2d at 494 n. 1. While Parker cites to several of these same United States Supreme Court cases found in Smith in support of his argument, he fails to note the main distinction with his case — he provided no evidence of an attempt to have a substantial relationship with his child.
¶ 24. The case before us presents an unusual set of circumstances regarding notice of the initial adoption proceedings in 2005. Undisputedly, Parker was not made a party or served with any formal notice. *1249 Yet these omissions do not automatically void the adoption, as Parker argues. The record indicates that Melanie placed Parker on notice that she intended to adopt Andy at their Waffle House meeting in March 2005, and he orally agreed to the adoption seven months before Melanie filed her petition.[7] Dana consented to the adoption the next month, and in October 2005, Melanie and Mark filed their petition for adoption, noting that there had been no adjudication of paternity. Additionally, Parker admitted at the hearing in July 2011 that he had actual knowledge from Dana that the adoption had been finalized five months after the final decree, in May 2006, but did not file a petition to set aside until approximately four years later. Therefore, the record shows Parker had knowledge of the adoption, but not formal notice through service of process or publication.
¶ 25. Pursuant to section 93-17-5(3), had Parker been made a party defendant to the adoption proceeding in October 2005, as an unwed father he would have been entitled to a determination of his “full commitment to the responsibilities of parenthood.” This determination was before the court at the hearing in July 2011, and will be discussed in the next section. As the United States Supreme Court cases cited above explain, constitutional protection is only provided to unwed fathers who demonstrate a supportive, significant relationship with the child. Caban, 441 U.S. at 392-94, 99 S.Ct. 1760; Quilloin, 434 U.S. at 256, 98 S.Ct. 549. Accordingly, the court’s finding that Parker did not meet this standard, in effect, negates his right to constitutional protection of his relationship with Andy. Therefore, as a matter of law, the failure to give notice to Parker of the original adoption does not, in and of itself, constitute reversible error.
2. Mississippi Rule of Civil Procedure 60(b) and Mississippi Code Annotated section 93-17-6
¶ 26. At the end of the hearing, Melanie’s attorney argued that Parker’s petition was in the nature of a Rule 60(b) motion to set aside what Parker argues is a void judgment — the initial adoption decree of 2005. In contrast, Parker’s attorney argued that the United States Constitution prevents casting the case solely as a Rule 60 matter, because Parker was never a party to the adoption. The chancellor determined that Melanie had moved for a dismissal of Parker’s petition under Rule 60(b), and concluded that Parker’s petition had not been filed within a “reasonable time” under Rule 60(b), and also failed under the statutory requirements of section 93-17-6. Therefore, he dismissed Parker’s petition and terminated his parental rights.
¶ 27. Parker contends that the chancellor improperly applied Rule 60(b) and section 93-17-6 to his petition. Alternatively, Parker claims that even if the chancellor was correct in applying these rules, he abused his discretion in dismissing Parker’s claim under section 93-17-6.
¶ 28. While Rule 60 was not the appropriate vehicle for dismissal of Parker’s petition, the point is moot since Parker did not meet the standard regarding a “full *1250 commitment to the responsibilities of parenthood” under section 93-17-6.
A. Rule 60(b)
¶ 29. Rule 60(b)(6) states, in pertinent part: “On motion ... the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: ... (6) any other reason justifying relief from judgment. The motion shall be made within a reasonable time ...(Emphasis added.) The standard of review for “a motion for relief under Rule 60(b) is limited to whether the trial court abused its discretion by ordering or denying relief.” Iuka Guar. Bank v. Beard, 658 So.2d 1367,1373 (Miss. 1995) (citing January v. Barnes, 621 So.2d 915, 927' (Miss.1992)).
¶ 30. In the chancellor’s bench opinion regarding Rule 60(b), he noted Andy was one year and seven months old when adopted by Melanie and Mark. Parker filed his petition to set aside the adoption four years and five months after the adoption, when Andy was almost six years old. The chancellor found that under the circumstances, this was not within a “reasonable time” pursuant to Rule 60(b). From the testimony, Parker had known about the adoption for at least four years, since May 2006. During this time, Parker had not seen his son or attempted to visit him; so Andy would not remember anything about Parker. The chancellor noted that with very little effort Parker could have learned about the adoption even sooner, because he knew all of the parties.
¶ 31. On appeal, Parker does not elaborate on a Rule 60(b) error; he only mentions it by way of his issue statements. In the adoptive parents’ brief, however, they cite two cases that are instructive on denial of Rule 60(b) relief in an adoption context. In M.D.T., the natural parents petitioned to set aside the adoption nine years after signing their consent. M.D.T., 722 So.2d at 703 (¶¶ 2-3). The natural parents made several arguments, including that the adoption was void, and thus their petition needed only be made within a “reasonable time” under Rule 60(b), and not six months under the statute of limitations. Id. at 705 (¶ 15). The supreme court was unpersuaded, holding that even if “a reasonable time” were the correct standard, the petition filed nine years after entry of the adoption decree was not made within a “reasonable time.” Id. at (¶ 16).
¶ 32. In J.E.B., the natural father filed a petition to vacate the adoption three years after it was agreed upon, alleging it was void. J.E.B., 822 So.2d at 950-51 (¶ 3). The supreme court reversed the chancery court’s grant of the petition to vacate the adoption, reinstating the adoption. Id. at 953 (¶ 15). Finding no jurisdictional defect with the adoption, the supreme court found the petition barred by the six-month statute of limitations. Id. The supreme court stated:
[The father/petitioner] should not now be heard, years later, to set aside the decree because it allowed him to retain his parental rights.... Finally, to the extent that he claims relief under Rule 60(b), he is likewise untimely. The motion, as to the allegations of fraud and misrepresentation[,] was not made within six months and as to other claims was not made “within a reasonable time.”

Id.

¶ 33. In each of these cases, the parents had, by their consents, been made parties to the original proceedings. In the case before us, Parker was not made a party defendant and did not file a consent to the adoption. Therefore, Rule 60(b), which “relieve[s] a party ... from final judg *1251 ment,” is not applicable.[8] The chancellor may, however, have considered the effect of Parker’s delay in asserting his parental rights on Andy under doctrines of waiver or laches. While Rule 60(b) was not the proper vehicle, this is not dispositive of the case.
B. Mississippi Code Annotated Section 93-17-6
¶ 34. The chancellor found that Parker failed to meet the statutory requirements of section 93-17-6 regarding his right to object to the adoption.
¶ 35. This Court’s scope of review is limited regarding a chancellor’s findings of fact. They will not be overturned “when supported by substantial evidence unless an erroneous legal standard is applied ....” In re B.N.N., 928 So.2d 197, 200 (¶ 6) (Miss.Ct.App.2006) (quoting Grafe v. Olds, 556 So.2d 690, 692 (Miss.1990)). Additionally, we are reluctant to disturb findings of fact because “[t]he credibility of the witnesses and the weight of their testimony, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation, are primarily for the chancellor as the trier of facts.” Rodriguez v. Rodriguez, 2 So.3d 720, 724 (¶ 6) (Miss.Ct.App.2009) (quoting Rainey v. Rainey, 205 So.2d 514, 515 (Miss.1967)). However, the chancellor’s “interpretation and application of the law is reviewed under a de novo standard.” Nichols v. Funderburk, 883 So.2d 554, 556 (¶ 7) (Miss.2004) (citing Tucker v. Prisock, 791 So.2d 190, 192 (¶ 10) (Miss.2001)).
¶ 36. Section 93-17-6 reads, in part:
(1) Any person who would be a necessary party to an adoption proceeding under this chapter and any person alleged or claiming to be the father of a child born out of wedlock who is proposed for adoption or who has been determined to be such by any administrative or judicial procedure (the “alleged father”) may file a petition for determination of rights as a preliminary pleading to a petition for adoption in any court which would have jurisdiction and venue of an adoption proceeding ....
(3) The sole matter for determination under a petition for determination of rights is whether the alleged father has a right to object to an adoption as set out in Section 93-17-5(3).
(4) Proof of an alleged father’s full commitment to the responsibilities of parenthood would be shown by proof that, in accordance with his means and knowledge of the mother’s pregnancy or the child’s birth, that he either:

(a) Provided financial support, including, but not limited to, the payment of consistent support to the mother during her pregnancy, contributions to the payment of the medical expenses of pregnancy and birth, and contributions of consistent support of the child after birth; that he frequently and consistently visited the child after birth; and that he is now uniting and able to assume legal and physical care of the child; or

*1252
(b) Was willing to provide such support and to visit the child and that he made reasonable attempts to manifest such a parental commitment, but was thwarted in his efforts by the mother or her agents, and that he is now willing and able to assume legal and physical care of the child.

(Emphasis added.)
¶ 37. The chancellor noted that before Parker could enjoy certain statutory protections as an unwed father, including his right to object to the child’s adoption, he had to prove a commitment to parenthood as explained in Section 93-17-6(4); namely, that he established a “substantial relationship” with the child. As authority, the chancellor pointed to the United States Supreme Court’s Caban, which established this standard for a putative father. See Caban, 441 U.S. at 393-94, 99 S.Ct. 1760.
¶ 38. Parker argues that the chancellor erred ⅛ applying section 93-17-6 because it was not “compulsory” that Parker file a petition for determination of rights — Parker’s petition objecting to the adoption was permissible under the statute. Parker claims any petition to determine rights under section 93-17-6 would have had to have been filed prior to the grant of adoption. However, Parker misconstrues the statute’s application. The chancellor was not penalizing Parker for not petitioning for a determination of rights, but analyzing the factors found in section 93-17-6(4) to determine if Parker could come to court and object to the adoption. Therefore, the chancellor did not err in applying the statute.
¶ 39. The chancellor made the following factual findings related to his analysis of section 93-17-6(4). Parker had proof of Dana’s pregnancy and Andy’s birth, but they were in a relationship for “convenience purposes.” They never married, but lived together at Parker’s parents’ home for three to six weeks, at which point she left because Parker was not helping to care for the infant. Of note was the fact Melanie’s residence in Decatur was approximately thirty miles from Brandon, where Parker resides, yet Parker claimed Melanie absconded with the child. Further, Parker testified that he was not presently in a position to pay child support. The chancellor did not find Dana’s testimony credible because she contradicted herself at the hearing, as well as contradicted her testimony from an earlier deposition. And the chancellor found Parker’s testimony was “suspect at best, ... trfying] to say what he needed to say to establish a relationship.” The chancellor concluded:
[Tjestimony has not shown that Mr. Parker has consistently provided support for the child, consistently tried to visit with the child. It does not show anything about him contributing any money towards medical expenses or the cost of the birth of the child.... There is no testimony that he is now willing and able to assume physical care for this child.... There is also no testimony that Mr. Parker made any reasonable diligent efforts to try to locate this child, to try to visit with the child, spend time with the child, and ... the testimony has established that without Dana[’s] bringing him into this [litigation,] he wouldn’t be here today.... She originally also was a party trying to set aside the adoption, but her case [was] dismissed because she signed a consent, and it was years, years later. The statute of limitations had run on her prior to the time she filed her complaint. So, once she was dismissed, then it all fell on Mr. Parker. He had to be the horse that everybody was riding. The trouble is it’s at best a three-legged horse.
¶ 40. On appeal, Parker argues that testimony showed Dana “absconded” with *1253 Andy when he was an infant, and intentionally deprived Parker from visiting him. After examining the record, we are not persuaded by this interpretation of the evidence. Further, our standard of review requires us to defer to the chancellor’s interpretation of the evidence as well as the weight and credibility of the witnesses. See Rodriguez, 2 So.3d at 724 (¶ 6).
¶ 41. Parker exhibited no interest in asserting his paternal rights until he was approached by Dana over four years after the adoption. Dana confirmed Parker’s testimony that she was paying for the litigation to set aside the adoption in the hope that if Parker won, she could obtain visitation rights. We note Parker did nothing to prevent Andy, in his infancy, from being adjudicated “neglected” by the youth court. Moreover, Parker did ve¥y little for Dana during the pregnancy or thereafter. In sum, he did not demonstrate actions indicative of any commitment to Andy, much less the required showing of a “full commitment to the responsibilities of parenthood.”
¶ 42. This issue is without merit.
C. Termination of Parental Rights
¶ 43. Parker’s parental rights were terminated in the chancellor’s judgment of August 2011. Parker does not make a separate argument regarding the termination, outside of his arguments above. Accordingly, we shall not address this issue.
¶ 44. THE JUDGMENT OF THE CHANCERY COURT OF NEWTON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, ROBERTS, MAXWELL, FAIR AND JAMES, JJ„ CONCUR. CARLTON, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.

. Pseudonyms are used in this opinion, rather than the parties’ names, in order to protect the identity of the child who is the subject of the adoption petition.

. The relevant statute regarding parties to an adoption proceeding and notice is Mississippi Code Annotated section 93-17-5 (Rev.2004), which states in pertinent part:
(1) There shall be made parties to the proceeding by process or by the filing therein of a consent to the adoption proposed in the petition, which consent shall be duly sworn to or acknowledged and executed only by the following persons ... :(a) the parents, or parent, if only one (1) parent, though either be under the age of twenty-one (21) years

(3) In the case of a child born out of wedlock, the father shall not have a right to object to an adoption unless he has demonstrated, within the period ending thirty (30) days after the birth of the child, a full commitment to the responsibilities of parenthood. Determination of the rights of the father of a child born out of wedlock may be made in proceedings pursuant to a petition for determination of rights as provided in Section 93-17-6.

(4) If such consent be not filed, then process shall be had upon the parties as provided by law for process in person or by publication, if they be nonresidents of the state or are not found therein, after diligent search and inquiry, or are unknown after diligent search and inquiry ....
(Emphasis added.)

.Section 93-17-6 sets out the procedure for a determination of rights of fathers of children born out of wedlock, and whether they can object to an adoption of such children.

. Melanie continued to reside in Decatur, Mississippi, after the divorce, and is Andy's sole provider.

. However, we note Parker attended only one of the youth court’s hearings about Andy, but it is unclear from the record which one.

. Section 93-17-6(4) states that “proof of an alleged father's full commitment to the responsibilities of parenthood” would be shown in financial support to the mother and child, or visiting the child.

. Section 93-17-6 gives an unwed father, such as Parker, the right to petition for determination of his rights as a putative father, and whether he could object to the adoption. Parker failed to take advantage of this procedure, just as he initially refused to take advantage of the paternity tests ordered by the youth court. Importantly, Parker delayed confirming his paternity for several years after the child was born. Testimony shows Parker ignored court recommendations for DNA paternity testing, but he finally complied in January 2011, over five years after the child was born.

. Rule 60(b) states that the "rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to set aside a judgment for fraud upon the court." Since Parker is not a party to the judgment, Rule 60(b), including its requirement that the motion be filed within a reasonable time, is not applicable. See also Morrel v. Nationwide Mut. Fire Ins. Co., 188 F.3d 218, 222 (4th Cir.1999) (“[A] motion for relief under Rule 60(b) ... may be brought only by, or on behalf of, a party to the action that generated the contested judgment[.]”); United States v. 8136 S. Dobson Street, Chicago, Ill., 125 F.3d 1076, 1082 (7th Cir.1997) (person seeking relief from a judgment under Rule 60(b) “must have been a party”).